HELEN EPHREMIAN *vs.* MORRIS B. SHOLES *d. b. a.* HILLSGROVE COUNTRY CLUB ROLLER SKATING.

APRIL 9, 1947.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J.  This action of trespass on the case for negligence was tried to a jury in the superior court and resulted in a verdict for the plaintiff in the sum of $8000.  The defendant's motion for a new trial was denied on the condition that the plaintiff remit all damages in excess of $7000.  The plaintiff filed such remittitur and the defendant thereupon excepted to the denial of his motion.  The case is before us on that exception and on exceptions to the denial of his motion for a directed verdict, to rulings on evidence, to portions of the charge, and to the amount of the damages.

The only count in plaintiff's declaration alleged in substance that the defendant negligently permitted fast and reckless skating in an aisle adjacent to but not a part of the skating area proper, and that, as the plaintiff was standing at a refreshment counter in that aisle, she was injured when she was run into and thrown to the floor by a woman who was skating in a fast and reckless manner.  Under this declaration the plaintiff's proof sought to establish that the defendant either failed to provide reasonable supervision against fast skating in the aisle, or that the attendants charged with such supervision were negligent in the performance of their duty.  The defendant introduced proof to rebut plaintiff's claim on both of these issues.

The building in which the defendant carried on a roller-skating business was 275 or 300 feet long by about 65 feet wide.  The area set off for skating was enclosed by an iron railing, with openings at or close to each end of a main aisle about eight feet wide, hereinafter called the aisle, which ran along the entire length of the westerly side of the building. A skate room, lounge room, checkroom, soda bar and other accommodations were located on this aisle. Patrons entered

the rink through a door which opened directly on the aisle, and admission tickets were collected at this door, usually by a special policeman in uniform.

Skaters used the aisle for various purposes, including the going to and from the skating area to the various facilities of the building and to the soda bar, which was located on the westerly side of the aisle and at the southerly end thereof. Signs reading "No fast skating" were displayed along the aisle. When a specialty number was announced, those who did not participate therein left the skating area and congregated in the aisle until general skating was resumed.

The plaintiff testified that she, Dorothy E. French, and Willie Paul Frye, who will hereinafter be referred to as Dorothy and Willie, went to the rink about 9 p. m. on May 4, 1943; that, after Willie had bought the tickets and handed them to the policeman at the door, whom plaintiff identified as John H. Hallbauer, they skated for about one half hour, until a specialty number was announced, whereupon Willie suggested that they go to the soda bar for a drink, which they did; that Dorothy and Willie, carrying their drinks with them, moved over to the iron railing to watch the specialty number, while she, the plaintiff, remained seated on a stool at the soda bar with her back to the skating area; that, when she had finished her drink and was about to walk away from the soda bar, a woman skater ran into her and threw her to the floor, severely injuring her left leg. The woman skater disappeared in the crowd and the plaintiff was taken to the lounge room, from which she was removed to a hospital. Defendant's son testified that at the time of the accident, which he did not see, there were some eighty persons in the aisle.

Dorothy testified that she was near the iron railing with Willie; that, as she was looking at the specialty number, she heard him exclaim "Watch out"; and that, as she turned around at this exclamation, she saw the plaintiff on the floor close to the soda bar.

Willie, whose testimony was read from the transcript of a prior trial, corroborated the plaintiff and Dorothy, and further testified that he was about 12 feet away from the plaintiff as he was standing at the railing with Dorothy; that his position was such that the plaintiff was diagonally in his line of vision; and that, about 30 feet from him, he saw an attendant who was leaning against the wall of the aisle, smoking a cigarette and watching the specialty number that was then in progress.

Willie further testified that, with conditions as just described, he saw a woman, who was skating with a partner in the rink, break away from him and, skating very fast across that area, enter the northerly end of the aisle at the same speed; that, although she almost lost her balance when she was about to enter the aisle, she nevertheless continued to skate along the whole length of the aisle at the same speed "toward where I was standing. As she was skating up there, she kept veering over to the right and looking back into the rink, and I saw she was going to run into Miss Ephremian, and I hollered to Miss Ephremian to watch out", and that this skater ran into the plaintiff at about the same time. According to Willie, this woman skated in front of the attendant, who, although in a position to see her, made no effort to stop her. She disappeared during the commotion that followed the plaintiff's fall and, although described in general terms by Willie, she apparently remained unidentified by every one who testified in this case.

The defense maintained that there was no such accident near the soda bar as was described by the plaintiff and her witnesses. Relying upon a signed statement by a witness who repudiated it in part at the trial, the defendant claimed that the plaintiff was injured at one of the exits by tripping over a girl who had fallen while skating. In this situation and at defendant's request the jury was asked to make a special finding as to where the accident happened, and they found specially that the accident took place near the soda bar.

The evidence for the respective parties as to the supervision over skating in the aisle was in substance as follows. Willie, Dorothy and various other patrons, including a number of former employees of the defendant, testified that they saw considerable fast skating in the aisle on the evening of May 4, 1943, before the plaintiff was injured; and that Hallbauer, the policeman at the door, was the only person who supervised skating in the aisle on that evening. Over defendant's objection, some of these witnesses further testified that they saw fast skating in the aisle on various evenings prior to May 4, and that at such times, with the exception of a temporary appearance of the defendant or his son, the only supervision over skaters in the aisle was exercised by the policeman, who ordinarily remained at the entrance door to the rink.

John H. Hallbauer, the special officer on duty the evening of May 4, testified that he had seen fast skating in the aisle on that evening and on other evenings prior thereto; that, on nights when he was on duty, he alone supervised skating in the aisle, except when the defendant or his son appeared there for a short time; that the aisle was too big for one man to prevent fast skating, and that ordinarily all he could do was to stop fast skaters who passed near him while he was at the door.

Two former employees of the defendant testified that the attendants who supervised skating in the rink proper had nothing to do with skating in the aisle. One of these, Thomas W. Prendergast, further testified that when a specialty number was on the floor such attendants usually had "a chance to get a blow", meaning an opportunity to smoke, "or have a soda."

The evidence for the defendant on the question of supervision was that two persons in addition to the policeman were usually charged with the duty of supervising skating in the aisle; that on the evening of May 4 Edwin Newell and the defendant's son, as well as Hallbauer, were acting in that capacity; and that, according to Newell and defendant's son,

there was no fast skating in the aisle and no accident therefrom to the plaintiff on that evening. Both Newell and defendant's son testified that the plaintiff was not injured at the place and in the manner described by her and her witnesses.

As already stated, the only count in plaintiff's declaration charges the defendant with negligence in not providing reasonable supervision over the conduct of patrons in the aisle. We shall therefore confine ourselves to the law applicable to the particular facts of this case. It is conceded that the defendant was not an insurer of the plaintiff's safety while she was in the aisle or at the soda bar. But, on the other hand, he was not absolved from all duty to use reasonable care for her safety. In our judgment, he was bound to exercise such care for her protection as the ordinary prudent operator of a skating rink would exercise under the same or similar circumstances. It was his duty, while she was in the aisle or at the soda bar, to provide such supervision for the aisle as might reasonably be expected to protect her against dangers known to or reasonably to be foreseen by him in the exercise of due care.

There are certain things that the defendant knew or reasonably should have known with reference to the use of the aisle by patrons going to the facilities of the building or to the soda bar, especially when a specialty number was in progress, at which time most of the patrons congregated in the aisle to watch the specialty number or for other purposes of their own. Furthermore, in such circumstances, an ordinary prudent operator would realize that a patron, whether on skates or not, would then be more interested in his personal purpose, as in going to or leaving the soda bar which the operator maintained for profit, rather than in watching out for reckless skaters.

The evidence shows that the defendant knew or reasonably apprehended some danger to patrons in the aisle from reckless skaters, as otherwise he would not have posted signs along the aisle prohibiting "fast skating", which term, in

view of existing circumstances in evidence could reasonably have been interpreted as amounting to skating in a reckless manner so as to endanger the safety of patrons in the aisle. In view of such knowledge by the defendant, the fundamental question in the instant case is whether the defendant provided reasonable supervision for the enforcement of the warning that was given by the signs, and, further, if he did provide such supervision, whether those charged with that duty executed it in a reasonably proper manner. These issues clearly raised questions of fact for determination by the jury.

We will first consider defendant's exceptions numbered 4 to 22, inclusive, which relate to the admission of testimony of fast skating in the aisle on occasions prior to May 4, 1943. In support of these exceptions defendant urges that such evidence was immaterial and its repetition necessarily prejudicial, because he had taken measures to guard against fast skating by posting rules and signs warning skaters not to skate fast in the aisle; and also because such evidence had no bearing on the question as to whether the defendant had a reasonable opportunity to prevent the accident. We find no merit in either contention. The mere posting of the signs in itself would not absolve the defendant from the exercise of further reasonable care in the circumstances. The evidence under consideration was admissible for the purpose of proving that the defendant actually knew or in the exercise of due care should have known the danger reasonably to be apprehended from fast and reckless skating in the aisle, particularly in the area of the soda bar where patrons would have relaxed their own attention. Such knowledge, actual or implied, in turn had a bearing upon the question of whether, in the circumstances, the defendant had a reasonable opportunity to prevent the accident. Exceptions 4 to 22, inclusive, are overruled.

Exception 23 is to the denial of defendant's motion for a directed verdict. Under this exception he stresses the testimony of Willie to the effect that there was an attendant in the aisle, and then argues that, since the accident happened

in the space of a few seconds, the attendant in question did not have a reasonable opportunity to prevent the accident. However close the question of defendant's liability may appear to be, we cannot say that the conclusion urged by him is the only reasonable conclusion possible when all the evidence is taken into consideration, especially since the plaintiff, according to the rule governing a defendant's motion for a directed verdict, is entitled to every favorable inference which may reasonably be drawn from the evidence. There was evidence in the record before us showing that the skater who ran into the plaintiff was skating recklessly even before she reached the aisle.

Even if there was an attendant in the aisle, as Willie testified, there was also evidence which, if believed, was reasonably open to the inference that he was an attendant for the regular skating area only, or that he was not attending to his duty but was interested in watching the specialty number then in progress. Furthermore, the evidence was in serious conflict as to what supervision the defendant in fact provided against fast skating in the aisle, particularly in the area where patrons were invited to use the soda bar. The determination of this question would have a material bearing on the question of whether, in the circumstances, the defendant was guilty of actionable negligence.

The case of *Emerson* v. *Riverview Rink & Ballroom,* 233 Wis. 595, upon which the defendant strongly relies, is clearly distinguishable on its facts from the instant case. As far as appears in that opinion, there was no evidence in that case comparable to the testimony of Willie in the instant case with reference to the conduct of the fast skater and of defendant's attendant before the skater ran into the plaintiff. Again, on the question of supervision, at page 598 of the opinion, the court stated that it could "discover no evidence that the number of guards provided was insufficient to meet the needs of the rink and render it reasonably safe", which is quite different from the situation on this point disclosed by the conflicting evidence in the case at bar. And, finally, even

though the court in the *Emerson* case did not rest its decision on the theory of assumed risk, yet it did refer to the plaintiff negligently exposing herself to injury by standing where she was at the time of the accident. In the instant case there was no evidence in support of such a theory. Exception 23 is overruled.

Under exceptions 24, 25 and 26 the defendant argues that certain portions of the charge mentioning supervision were calculated, by reason of emphasis, to prejudice him. We have carefully examined the charge and find nothing therein to support such conclusion. In fact, the trial justice, at defendant's request, instructed the jury that if the defendant, his agents and servants had no reasonable opportunity to prevent the happening of the accident, the defendant was not guilty of negligence. These exceptions are overruled.

Defendant's exceptions 27, 28, 29 and 30 are to the denial of his motion for an unconditional new trial. In addition to substantially the same grounds urged by him upon the motion for a directed verdict, he now urges under exception 29 that the verdict was the result of passion and prejudice because, in cross-examination, his son and manager, Leonard Sholes, who was thirty-one years old, was asked his age on two occasions and was further closely questioned as to his connection with and attendance at the rink. However, at the trial he did not object to such inquiry, nor did he move to pass the case on the ground of prejudice. He now argues that "the repeated questions calling attention to his (Leonard's) age and his constant attendance at the rink during the war period could only have been asked for the purpose of insidiously prejudicing him and the defendant's case because he had in some manner escaped service. On the other hand the plaintiff had been to some extent visibly crippled in the defendant's rink." This contention is pure speculation and therefore is without merit.

In denying defendant's motion for a new trial the trial justice said in his rescript that the credibility of the plaintiff's witnesses was "far more impressive" than that of the

defendant's. Defendant contends that in thus evaluating the testimony of Willie the trial justice erred because he did not see Willie, as his testimony was read into the record by a court stenographer from her notes in a previous trial of the case. The defendant therefore contends that, since Willie was the only witness who claimed to know the manner in which the accident occurred, the decision of the trial justice on the motion for a new trial should not be given the same weight that is ordinarily given to such a decision in this court, and that in the circumstances we are in as good a position as the trial justice in passing upon the credibility of Willie's testimony.

We cannot follow the defendant on this point. When the rescript is read in the light of defendant's evidence, it is clear to us that the trial justice used the questioned expression to emphasize his view of the evidence for the plaintiff rather than to stress the testimony of a particular witness. However, our examination of the transcript shows that Willie's testimony was not inherently incredible or improbable, and that the trial justice did not misconceive or overlook any evidence to the prejudice of the defendant. Therefore, we cannot say that on the sharply conflicting evidence in the record before us he was clearly wrong in denying the defendant an unconditional new trial. Exceptions 27, 28, 29 and 30 are overruled.

Under exception 31 the defendant contends that the amount of $7000 as damages, which was fixed by the remittitur of the trial justice, is still excessive. He suggests that $5000 would be a more reasonable award. The plaintiff's injury consisted of "a fracture of both sides of the ankle; both the malleoli, as they are called". The medical testimony for the plaintiff, which was the only medical testimony in the case, was to the effect that there was a fracture of the internal bone, or "malleolus", which healed with a bony union for about one quarter of the length of the fracture and with a "fibrous union" for the remainder thereof. There was also medical evidence that the plaintiff was suffering from trau-

matic arthritis at the place of injury. All the doctors agreed that she had a permanent partial disability and would probably limp for the rest of her life. The plaintiff further testified that since her recovery to the extent just stated she could not stand for any length of time without pain, especially in bad or cold weather.

The actual money loss suffered by the plaintiff in wages, doctors' bills, hospital bills and other incidental expenses amounted to approximately $2400. Under the damages as reduced by the trial justice she would receive $4600 for her pain and suffering, both past and prospective, and for whatever permanent injury she sustained, which will probably handicap her for the remainder of her life and limit her field of future work. Even though the sum of $7000 may be liberal, we cannot say that it is still so excessive as to warrant us in further reducing the award. Exception 31 is overruled.

The exceptions not specifically mentioned herein have been examined and found to be without merit. All of the defendant's exceptions are overruled, and the case is remitted to the superior court for the entry of judgment on the verdict as reduced by the remittitur.

*Charles A. Curran, Peter M. O'Reilly,* for plaintiff.

*Henry M. Boss,* for defendant.